SCHWARTZ, Appellant, vs. SCHWARTZ, Respondent.

*December 7, 1931—January 12, 1932.*

*Allan V. Classon* of Oconto, for the appellant.

For the respondent there was a brief by *Winter & Winter* of Shawano, and oral argument by *P. J. Winter*.

FRITZ, J. Upon reviewing the record we are convinced that the evidence not only warranted the jury's findings, but entitled plaintiff to a directed verdict on the issues submitted. There is no substantial conflict in the evidence as to the crucial facts involved in the determination of those issues. It is not sufficient for the issuance of a warrant, under sec. 362.03, Stats., that there has been an utterance of a threat to commit an offense against the property or person of another. It must appear upon examination by the magistrate, before the warrant can be issued, "that there is just cause to fear that any such offense may be committed." To meet that statutory requirement, as basis for obtaining the warrant upon which he caused the arrest of plaintiff on April 24, 1928, the defendant, after stating in his verified complaint that Hannah Schwartz on April 21, 1928, threatened to assault and commit bodily injury upon Margaret Schwartz by threatening and saying, "If she comes over here I'll lay her cold," further stated in his complaint "that he has just reason to fear that said Hannah Schwartz will carry out said threats and commit said offense." The evidence in the case at bar establishes, without any reasonable basis for finding otherwise, that, when defendant verified that complaint, he did not have just reason for any such fear. Plaintiff's reputation was good as a peaceable, law-abiding woman. She was born in Oconto county, and had lived there until she was about eighteen years of age. In 1926 she had married John Schwartz, who, although over forty years of age, had never been married. His relatives, including the defendant, viewed the marriage with considerable disfavor, and there developed an antagonistic attitude toward the plaintiff, although she was well and

favorably known in the community in which they resided. Thus, even defendant testified regarding her, "I knew her for some time, years before she married John, and knew her to be a nice woman or girl. I never heard of her doing any fighting or hurting anybody."

Plaintiff and her husband lived within a quarter of a mile of defendant's farm, and in May, 1927, a baby was born. Before that birth disputes had occurred between plaintiff and her husband because he spent too much of his time at defendant's home. After the child was born, John Schwartz spent more time at defendant's home, and would sometimes be sent for by Margaret Schwartz, the wife of defendant, during his absence. On such occasions John Schwartz would not return until late at night, which caused many disputes between him and plaintiff. In the heat of such an argument between them only, and in their own home, on April 21, 1928, plaintiff said to her husband, in reference to defendant's wife, Margaret, "If you bring her over here I'll lay her cold." John Schwartz immediately went over to defendant's home to tell him and his wife what plaintiff had said; and plaintiff, with her eleven months old baby which she was then nursing, left her house and walked toward defendant's farm. As she proceeded down the road, her husband and the defendant and his wife came out of their driveway onto the road. Defendant ran up to plaintiff and, shaking his fist in her face, said, "I will fix you for threatening to lay my wife cold." Plaintiff, without any violence or threat on her part, turned around and returned to her home. Within a short time thereafter her husband and defendant and his wife, together with August Fisher and his wife, who are relatives of the Schwartzes, came into plaintiff's home to force her to apologize to Margaret Schwartz for having said that she would lay her cold. Thus defendant testified, "I deliberately went into Hannah Schwartz's home to settle the question to see if she would

lay my wife cold." Instead he saw plaintiff offer his wife a chair, without any inclination to molest her. Plaintiff did not apologize, but her husband put his papers in a box and took them out of the house later that night.

On April 22, 1928, plaintiff and her brother met John Schwartz by appointment for a conference at a soft-drink parlor. During that conference the defendant entered. Putting his fist in plaintiff's face, he threatened plaintiff and said, "I will show you who is going to talk to John Schwartz." He then took John Schwartz into another room, from which plaintiff was excluded. Defendant's wife remained outside and left when defendant drove away. During all of that occasion there was no indication of any violence or threat on plaintiff's part, notwithstanding the provocation afforded by defendant's conduct toward her. Without any further occurrence or meeting between defendant or any of his relatives and the plaintiff, defendant, on April 24, 1928, caused the arrest of plaintiff on his sworn statement that he had "just reason to fear that the said Hannah Schwartz will carry out said threats and commit said offense."

The facts and circumstances stated above were all known to defendant. Most of the occurrences were in his presence. Notwithstanding the provocation afforded by defendant's own threats of violence toward plaintiff, he had seen his wife in plaintiff's presence on three occasions, one of which was at plaintiff's residence—the very place at which she had said that her threat was to be executed; and he was aware that on none of those occasions had plaintiff evidenced the slightest inclination by threat or otherwise to commit any offense toward any one. Clearly, neither he nor any one else had any reason, on April 24, 1928, to fear the commission of any offense by plaintiff. Rightly, "probable cause has been defined to be such a state of facts in the mind of

the prosecutor as would lead a man of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested is guilty." *Eggett v. Allen,* 119 Wis. 625, 96 N. W. 803. The state of facts set forth above, which, because of his participation therein, was necessarily in the mind of the defendant, was such that it is wholly improbable that he, as a man of ordinary caution and prudence, believed or entertained any honest and strong suspicion that plaintiff would commit any offense. In *Eggett v. Allen, supra,* this court said: "Mere belief of the defendant in plaintiff's guilt, however strong, sincere, and honest, will not constitute probable cause unless founded on circumstances sufficient in reason to warrant it." In the case at bar, the facts and circumstances, which were necessarily known to the defendant, were not merely insufficient to warrant such belief of plaintiff's guilt as to constitute probable cause, but, on the contrary, in connection with other facts in relation to the peace-warrant proceedings which are hereinafter stated, convincingly demonstrate that defendant set the criminal law in motion for the ulterior and malicious purpose of embarrassing and humiliating plaintiff.

Likewise as to the proposition that the defendant did not make a full and fair disclosure of the facts known to him to the district attorney before the warrant was issued. As was said in *Haas v. Powers,* 130 Wis. 406, 110 N. W. 205:

"Respecting the defense that defendant acted upon the advice of counsel, circumstances already considered have a bearing. To rest upon this defense requires that the defendant sought such advice and followed it in good faith. To fulfil such requirements, it must appear that he fully and fairly stated the material facts and his knowledge of the transaction to counsel, and that such advice led him to the honest belief that plaintiff was guilty of the offense of which he complained against him. If the evidence upon this sub-

ject fails to establish such facts clearly and without dispute, then it must be left for decision to a jury." See, also, *Leslie v. Knudson*, 205 Wis. 517, 238 N. W. 397.

In the case at bar defendant testified, in relation to his calling on the district attorney, John B. Chase, as follows:

"I told him I wanted a peace warrant for Hannah Schwartz. I told him she was going to lay my wife cold. Q. Did Mr. Chase advise you you could have her arrested for that? A. I can't just recall whether he did or not. Q. You didn't tell him of any of the facts that led up to this; how she happened to say it? A. No. I can't recall whether I told him that John Schwartz, her husband, came over and told me she said that."

Mr. Chase, whose ability as district attorney and credibility as a witness were unquestioned, testified as to defendant's visit, "He simply told me that he wanted to get a peace warrant for Hannah Schwartz and I told him that those things were taken care of by the justice of the peace, and I could get the justice of the peace to come up and take his complaint." Manifestly, the mere statement that plaintiff was going to lay defendant's wife cold, falls far short of a full and fair disclosure of the material facts within defendant's knowledge. Nothing was said as to the circumstances under which plaintiff uttered the threatening remark during a heated quarrel with her husband in her own home and in the absence of defendant's wife; that the threat was merely as to what plaintiff would do if defendant's wife came into plaintiff's home; that instead of plaintiff acting as she had threatened, there was no indication of any violence or threat on plaintiff's part when, on that very evening, the parties, including defendant's wife, met on the road, and when later on defendant's wife even came into plaintiff's home and was there offered a chair by plaintiff; that likewise there was no threat or attempt to injure defendant's wife when, two days later, plaintiff saw her after the conference in the soft-drink parlor; and that there had been no repetition of the threat, or attempt at violence by plaintiff whatsoever, even under

provocation. The facts as to what plaintiff did and refrained from doing on those occasions were all within defendant's knowledge and they were all material and necessary to enable the district attorney to advise as to the issuance of a warrant. As it is undisputed, under the evidence, that defendant failed to disclose those facts to the district attorney, plaintiff was entitled to have a finding to that effect as a matter of law.

However, defendant contends that even if the warrant was issued without probable cause and maliciously, and without having fully and fairly stated the known and material facts to counsel, the dismissal of plaintiff's complaint was proper because the dismissal of the criminal proceedings was brought about by the procurement of plaintiff. Defendant relies upon the rule stated in 38 Corp. Jur. pp. 443, 444, § 95, viz.:

"Where the termination of a criminal prosecution or civil action has been brought about by the procurement of defendant therein, or by compromise and settlement, an action for malicious prosecution cannot be maintained."

However, in the next sentence it is said:

"A limitation of the rule, recognized by some decisions, is that the procurement or compromise must be voluntary and not induced by duress; . . ."

That limitation of the rule was recognized in *Watkins v. Baird,* 6 Mass. 506, 511; *Morton v. Young,* 55 Me. 24, 92 Am. Dec. 565; *Lyons v. Davy-Pocahontas Coal Co.* 75 W. Va. 739, 745, 84 S. E. 744; *Robbins v. Robbins,* 133 N. Y. 597, 30 N. E. 977; *White v. International Text-book Co.* 156 Iowa, 210, 136 N. W. 121, 42 L. R. A. N. s. 346, 349. In the case last cited the court said:

"Admitting for the purpose of the discussion that one may be precluded from prosecuting such an action by voluntarily procuring its settlement and dismissal, it is quite clear, we think, under the later and more modern authorities, that this must be voluntarily and understandingly done and for the purpose of putting an end to the proceedings. If

the settlement is brought about by duress, then it should not be held a bar to an action for the malicious use of the processes of the criminal law."

In *Lyons v. Davy-Pocahontas Coal Co., supra,* the court said:

"Returning to the evidence, plaintiff was not bound by the paper signed by him to procure his discharge from jail, he being then under duress. . . . The evidence presents a case showing a flagrant misuse of the criminal process by a landlord, to eject his tenant, who, after having procured his arrest and imprisonment unlawfully, exacts from him a promise in writing not to sue for the wrong done, as a condition of his release. Such wrongs ought not to occur in a free country governed by law. Although plaintiff introduced the paper, he had a right, under the circumstances of this case, to prove that he signed it in order to obtain his liberty."

In *Robbins v. Robbins, supra,* the court said:

". . . Take a case like this: A poor and helpless woman is arrested, and the police justice informs her, before he makes his final decision, that he is inclined to hold her to bail, and she, being friendless and unable to furnish bail, promises good behavior in the future if he will discharge her, and then he enters a discharge. What reason can there be for holding, in such a case, if she can show that the criminal proceeding was instituted maliciously and without probable cause, that she may not maintain her action for malicious prosecution? The circumstances under which she was discharged may furnish competent evidence upon the issue of probable cause and malice and on the question of damages; but proof that the discharge was made under such circumstances cannot, upon principle, furnish an absolute bar to the action."

That was, in effect, virtually the situation in this case, as disclosed by the evidence without any material conflict.

Clarence Davis, the constable, testified:

"I placed her under arrest. . . . I told Mrs. Schwartz it was a peace warrant, and I would have to bring her to

Oconto, but then I said there might be a possibility of fixing it up, and all she would have to do would be pay the costs of the court. I said, 'Go over and find out from Mrs. Leopold Schwartz if she would withdraw the charge if she would apologize for what she said.' I made that suggestion to Mrs. Schwartz. At that time John Schwartz came into the house. . . . In regard to furnishing bail for Hannah Schwartz, Fred Lear said at that time that if John Schwartz didn't sign her bond, he would. I did not hear John make any suggestion or say he would furnish his wife with a bond. He was near enough to me so that he could have heard me, as it was only a small room where we were all standing. In furtherance of carrying out the suggestion I made as to what might be done, we went over to Schwartz's. I started down the road and then John Schwartz and his wife came behind me in their car. I did not go in Leopold's house; I stayed on the road. I met Leopold right on the road between the two residences. I spoke about Hannah being willing to apologize if he would withdraw the charge, and Leopold seemed well satisfied with that. Then he walked back to. the house and got Mrs. Leo Schwartz out, and they came out to the car, and Mr. Schwartz told her about this, and Mrs. Hannah Schwartz said, 'I am sorry for saying what I said, that I would lay you cold.' They both stuck out their hands and shook hands and called it off."

Plaintiff testified:

"I think it was between 9 and 10 when Mr. Davis came over on the morning of the 24th. My baby was eleven months old at that time; I was nursing the baby at that time. . . . I had never been placed. under arrest before. When this warrant was read to me and I was placed under arrest, it was a sort of a shock all the way through, and I didn't know just what to make of it. Mr. Davis and I talked it over. Of course, I hesitated really what to do; I had never been in anything like that. . . . Mr. Davis suggested that I apologize. I heard Mr. Davis testify as to what I did, and that is right. I agreed to make this apology, I would say, on the baby's part. Before this apology matter was gone into there was something said about my bail.

Mr. Davis said he didn't know but what I would have to furnish bail. John came in at the time the warrant was read. Of course he never said anything. My brother spoke up and said, 'If John doesn't go your bail, I will.' John didn't say he would go my bail; I can't recall that he answered. I made this apology because I wasn't ready to break up the home; I don't know how I would express it."

Fred Lear, plaintiff's brother, testified:

"I was in the house with Mr. Davis when he read the warrant to my sister. Mr. Davis said, 'You will have to have bail; otherwise you will be locked up.' John Schwartz, her husband, was there at the time, but he didn't say anything, and I said, 'If John Schwartz isn't man enough to bail his wife out I will bail her out.' "

Defendant testified:

"On Tuesday, after the complaint had been signed, Mr. Davis came up and asked if I wanted to withdraw that complaint, and I said if she wanted to come and apologize I would. Then Mr. Davis went in and asked Mrs. Hannah Schwartz, and he came out and said she would apologize."

John Schwartz testified:

"When Davis came over and read the warrant to her I heard something said about going bail for my wife, but they didn't ask me for bail. I didn't want to go her bail. I wanted her to apologize. . . . I heard Fred Lear say, 'If John Schwartz don't go his wife's bail, I will,' and I didn't then offer to. She was right in the car with me when she made the apology." .

That afternoon defendant in writing formally withdrew the charge and plaintiff's husband paid the costs. An apology exacted of a woman, laboring under the duress of such circumstances, as the only means of obtaining the withdrawal of a warrant which defendant had maliciously caused to be issued, without probable cause, and as the only means of saving herself and her baby from the distress of traveling under arrest to a distant county seat to secure her re-

lease on bail, which her husband refused to furnish, certainly was not voluntary. As the resulting settlement was clearly induced by duress, and hence not voluntary, it constitutes no bar to this action for malicious prosecution.

It follows that upon the evidence plaintiff was entitled, as a matter of law, to recover the damages sustained by her. Consequently, plaintiff's right to judgment is not dependent on the findings of the jury on the issues of probable cause and defendant's failure to make proper disclosure of the facts to the district attorney. Under those circumstances, it is unnecessary to pass upon defendant's exceptions to the instructions to the jury regarding the burden of proof on those issues. The jury fairly assessed plaintiff's compensatory and punitory damages at $500 and $200, respectively, and plaintiff is entitled to judgment for those amounts.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment for plaintiff for the recovery of $700 as damages.